IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| LINDSAY J. LUDDEN, | |
| Plaintiff, | **8:19-CV-467** |
| vs. | |
| ANDREW M. SAUL, Commissioner of the Social Security Administration, | **MEMORANDUM AND ORDER** |
| Defendant. | |

Petitioner, Lindsay J. Ludden, filed suit against the Commissioner of the Social Security Administration ("the Commissioner") seeking to reverse, or in the alternative, remand the Commissioner's decision denying Ludden's claim for disability benefits. Filing 11. The Government seeks to affirm the Commissioner's decision. Filing 14. For the reasons stated below, the Court grants the Commissioner's motion and denies Ludden's motion.

## I.    BACKGROUND

The Court reviews Ludden's denied application for disability-insurance benefits under the Social Security Act. *See generally* 42 U.S.C. § 405. Administrative Law Judge ("ALJ") Kelly Humphrey affirmed the Commissioner's decision to deny Ludden's application. Tr. 22, 27, 81, 88. As discussed in more detail below, Ludden was born in 1974 and was later diagnosed with multiple sclerosis ("MS") in 1998. Tr. 143, 253, 648. She holds at least a high school education; is able to communicate in English; and has had past relevant work as an admissions clerk, customer service representative, and insurance agent. Tr. 20, 35, 170. She was thirty-eight at her amended alleged onset date of July 3, 2012, and was forty-four at the time of her administrative hearing on August

22, 2018. Tr. 10. Ludden was approximately 5'5" and weighed 210 pounds at the time of her amended alleged onset date. Tr. 650.

### A. Procedural History

Ludden applied for disability-insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 401 et seq., on July 18, 2016, with an alleged onset date of May 3, 2007. Tr. 10. The Commissioner denied the claim on November 4, 2016, Tr. 81, and upon reconsideration on March 17, 2017, Tr. 88. Pursuant to 20 C.F.R. § 404.929, Ludden submitted a timely request for a hearing before an ALJ on April 24, 2017. Tr. 10, 97. Ludden then testified before the ALJ on August 22, 2018, where she amended her alleged onset date to July 2, 2012.[1] Tr. 10, 31, 115. In addition to Ludden's testimony, Bob G. Zadow—an impartial vocational expert—testified at the hearing. Tr. 10, 49-55. On November 23, 2018, the ALJ found Ludden not disabled under 20 C.F.R. § 404.1520(g). Tr. 22. The Social Security Appeals Council thereafter denied Ludden's request for review of the ALJ's decision, Tr. 1, and she timely filed the present action with the Court,[2] Filing 1. The Court accepts jurisdiction in accordance with 42 U.S.C. § 405(g) to review the Commissioner's final decision.

#### 1. Administrative Hearing

Before the ALJ, Ludden testified she engaged in part-time, administrative work for approximately three months prior to her May 2012 alleged onset date. Tr. 35. When asked what precluded her from full-time employment, Ludden testified that her main issue was fatigue. Tr. 37. She reported her legs felt "like cinderblocks" and that she would have to rest after completing a

---

[1] Ludden testified at the hearing that the original May 3, 2007 alleged onset date was due to an online formatting error. Tr. 31. Therefore, the relevant timeline for Ludden's claim, hereafter, was from July 3, 2012, to June 30, 2013. Tr. 10. June 30, 2013, reflects Ludden's date last insured.

[2] On February 7, 2020, this case was reassigned to the undersigned judge pursuant to 28 U.S.C. § 636(c); *see also* NECivR 73.1(a); Filing 13.

couple tasks. Tr. 37. She would typically nap before picking up her son from school. Tr. 38. High temperatures—such as taking a shower or being outside—exacerbated her fatigue.[3] Tr. 46-47. Ludden engaged in physical therapy to alleviate fatigue and muscle weakness. Tr. 47-48.

Ludden went on to testify that she also experienced neurogenic bladder and bowel incontinence issues, Tr. 37, which caused her to use the restroom at unexpected times and to always "know where all the bathrooms are" while shopping, Tr. 44. Ludden was able to drive, take care of her child, prepare meals, shop, and perform some household chores with occasional assistance during the relevant period. Tr. 37-38, 43-45.

Ludden also suffered from depression and optic neuritis as a result of MS. Tr. 38. She stated that her depression did not affect her ability to work. Tr. 38. However, she described her optic neuritis "as if somebody ha[d] put Vaseline over [her left] eye" when trying to see with her right eye closed. Tr. 39. Ludden also testified that she had trouble looking at computer screens. Tr. 39. She did not have any restrictions on her driver's license, and she could read books for shorter periods of time, use her smartphone, and watch television with some limitations. Tr. 48-49, 56-57.

Finally, Ludden briefly described her medication history. After her son was born in 2007, Ludden resumed disease-modifying medication but had "severe, almost flu-like symptoms" following each Avonex injection. Tr. 40, 718. She transitioned to Gilenya but again exhibited cough and high blood pressure symptoms, and she subsequently stopped taking the medication in 2012. Tr. 40-41. There was an alternative drug available—Tysabri—but she testified it could have caused fatal symptoms, so she did not take it. Tr. 41.

---

[3] Throughout the transcript, questions and answers were at times presented and answered in the present tense, referring to 2018. The Court took care to discern, and discard when appropriate, testimony that did not refer to Ludden's relevant period.

Zadow, a court appointed vocational expert, testified during the hearing as well. The ALJ asked Zadow what work the following hypothetical individual would be capable of:

> [T]he same[] age, education, and past work as [Ludden], with the residual functional capacity to perform work at the light exertional level, except that the individual could not climb ladders, ropes, and scaffolds, and must avoid hazards such as high, exposed places and moving, mechanical parts. She must avoid all exposure to extreme heat as part of the job. And she can only occasionally read fine print or read from a computer screen.

Tr. 51.

Zadow opined that such a person would not be capable of performing Ludden's past relevant work as an admissions clerk (DOT Number: 205.362-018), customer service representative (DOT Number: 299.367-014), or insurance agent (DOT number 241.267-018). Tr. 20, 51. He stated that such a person would be able to work as a laundry worker (DOT Number: 302.685-010), packing line worker (DOT Number 753.687-038), or cashier (DOT Number: 211.462-010). Tr. 52. For these occupations, he stated the corresponding incidents of work in the United States were 895,000, 735,000, and 3,300,000 respectively. Tr. 52. When the ALJ changed the hypothetical to limit the individual to a sedentary exertional level with the same limitations as before, Zadow testified such an individual would have the capacity to work as a weight tester (DOT Number: 539.485-010), automatic grinding machine operator (DOT Number 690.685-194), or order clerk (DOT Number 209.567-014). Tr. 52-53. For these occupations, incidents of work in the United States were 454,000, 81,000, and 433,000 respectively. Tr. 52-53. Zadow opined that jobs at the sedentary exertional level would be eroded by at least fifty percent to account for Ludden's vision limitations. Tr. 53. Zadow also surmised a worker who was off task ten percent

of the workday—other than a regular break[4]— would be subject to corrective action while a worker who was off task fifteen percent of the time would likely be terminated. Tr. 54. Finally, Zadow testified that an employer would not tolerate taking more than two unscheduled days off per month. Tr. 54.

### 2. *The ALJ's Findings*

An ALJ is required to follow a five-step sequential analysis to determine whether a claimant is disabled. *See* 20 C.F.R. § 404.1520(a); *see also Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) ("During the five-step process, the ALJ considers (1) whether the claimant is gainfully employed, (2) whether the claimant has a severe impairment, (3) whether the impairment meets the criteria of any Social Security Income listings, (4) whether the impairment prevents the claimant from performing past relevant work, and (5) whether the impairment necessarily prevents the claimant from doing any other work." (quoting *Eichelberger v. Barnhart*, 390 F.3d 584, 590 (8th Cir. 2004))). The ALJ must continue the analysis until the claimant is found to be "not disabled" at steps one, two, four or five, or is found to be "disabled" at step three or step five. *See* 20 C.F.R. § 404.1520(a).

Step one requires the ALJ to determine whether the claimant is currently engaged in substantial gainful activity. *See* 20 C.F.R. §§ 404.1520(a)(4)(i), (b). The ALJ determined Ludden was not engaged in any substantial gainful activity from her amended alleged onset date of July 3, 2012, through her date last insured of June 30, 2013. Tr. 12.

---

[4] According to Title II, an individual performing sedentary work must remain in a seated position for approximately six hours out of an eight-hour workday with a morning, afternoon, and lunch break at approximately two-hour intervals. SSR 96-9P, 1996 WL 374185 (S.S.A. July 2, 1996).

Step two requires the ALJ to determine whether the claimant has a "severe impairment." 20 C.F.R. § 404.1520(c). A "severe impairment" is an impairment or combination of impairments that significantly limits the claimant's ability to perform "basic work activities," 20 C.F.R. §§ 404.1520(a)(4)(ii), (c), and satisfies the "duration requirement." 20 C.F.R. § 404.1509 ("Unless your impairment is expected to result in death, it must have lasted or must be expected to last for a continuous period of at least 12 months."). Basic work activities include "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "[c]apacities for seeing, hearing, and speaking"; "[u]nderstanding, carrying out, and remembering simple instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers and usual work situations"; and "[d]ealing with changes in a routine work setting." 20 C.F.R. § 404.1522. If the claimant cannot prove such an impairment, the ALJ will find that the claimant is not disabled. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii), (c). The ALJ determined Ludden had the following impairments through her date last insured: relapsing and remitting multiple sclerosis, hypertension, neurogenic bladder, and optic neuritis. Tr. 12. The ALJ did not find Ludden's depression, migraine headaches, kidney stones, vertigo, thyroid condition, or history of obesity to be severe impairments. Tr. 13.

Step three requires the ALJ to compare the claimant's impairment or impairments to a list of impairments which qualify an individual as disabled. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), (d); *see also* 20 C.F.R. § 404, Subpart P, App'x 1; 20 C.F.R. §§ 416.920(d), 416.925, 416.926 (explaining Appendix 1). If the claimant has an impairment "that meets or equals one of [the] listings," the analysis ends and the claimant is found to be "disabled." 20 C.F.R. §§ 404.1520(a)(4)(iii), (d). If a claimant does not suffer from a listed impairment or its equivalent, then the analysis proceeds to steps four and five. *See* 20 C.F.R. § 404.1520(a). After considering

Ludden's severe impairments, the ALJ determined she did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. Tr. 14.

Step four requires the ALJ to consider the claimant's residual functional capacity ("RFC") to determine whether the impairment or impairments prevent the claimant from engaging in "past relevant work." *See* 20 C.F.R. §§ 404.1520(a)(4)(iv), (e), (f). The ALJ considers "all of the relevant medical and other evidence" in the claimant's record when making an RFC determination. 20 C.F.R. § 404.1545(a)(3). With regard to a claimant's symptoms, an ALJ applies a two-step process. In step one, the ALJ determines whether the claimant has a medically determinable impairment that can reasonably be expected to cause the claimant's alleged symptoms. SSR 16-3P, 2017 WL 5180304 (S.S.A. Oct. 25, 2017). A claimant's subjective complaints alone are not sufficient to satisfy step one; there must be objective medical evidence in the record that can reasonably be expected to cause the alleged symptoms. SSR 16-3p (S.S.A. Oct. 25, 2017); *see also* 20 C.F.R § 404.1529(a)(a). Second, the ALJ measures the intensity, persistence, and limiting effects of the claimant's symptoms to "determine the extent to which an individual's symptoms limit his or her ability to perform work-related activities." SSR 16-3p (S.S.A. Oct. 25, 2017); *see also* 20 C.F.R. § 404.1529(a). The ALJ evaluates the objective medical evidence against the claimant's subjective complaints. SSR 16-3p (S.S.A. Oct. 25, 2017). "Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole." *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984).

"Past relevant work" refers to work performed by the claimant within the last fifteen years or fifteen years prior to the date that disability must be established. *See* 20 C.F.R. §§ 404.1565(a), 416.965(a). If the claimant is able to perform any past relevant work, the ALJ will find that the claimant is not disabled. *See* 20 C.F.R. §§ 404.1520(a)(4)(iv), (f).

After considering the entire record, the ALJ found Ludden had the RFC to perform sedentary work with limitations to include: avoiding high exposed places, extreme heat, and moving mechanical parts; refraining from climbing ladders, ropes, or scaffolds; and only reading fine print or reading from computer screens occasionally. Tr. 15. Summarizing Ludden's alleged symptoms, the ALJ said she exhibited depression, optic neuritis, persistent fatigue, neurogenic bladder issues, and side effects from taking disease-modifying medication as a result of being diagnosed with MS. Tr. 15, 37-49, 55-57. She took Ludden's testimony and the objective medical evidence into account and found Ludden's impairments could reasonably be expected to cause the alleged symptoms. Tr. 15, 19. However, the ALJ found Ludden's statements on the intensity, persistence, and limiting effects of her symptoms were not "entirely consistent with the medical evidence and other evidence in the record." Tr. 15-16. The ALJ found Ludden had some functional limitation based on the medical evidence but not to the degree she alleged in her statements and testimony. Tr. 16.

According to the ALJ, Ludden consistently declined resuming disease-modifying medicine despite having the ability to do so during the relevant period. Tr. 19. Ludden started taking Copaxone shortly after being diagnosed with MS in 1998. Tr. 16, 561. She remained on Copaxone until 2006 when she and her husband planned to have a child. Tr. 16, 561. She resumed medication until 2012 but began reporting headaches in 2010 as a result of high blood pressure caused by the medication. Tr. 16, 534. Ludden had an echocardiogram and other tests done in November 2010, but they came back normal, "demonstrating no physiological basis for her hypertension or organ damage." Tr. 16, 541, 544-47. She took anti-hypertensive medications to manage her blood pressure, Tr. 530, 532, which was successfully controlled through June 30, 2013, her date last

8

insured. Tr. 16, 524-31. Ludden stopped taking disease-modifying medication in March 2012 due to a low CD 4 count. Tr. 529.

In July 2012, Ludden saw Rena K. Zabad, M.D., for a second opinion on her MS treatment options. Tr. 17, 648. Dr. Zabad recommended several disease-modifying medications including Rebif, Tysabri, beginning an OPERA trial which compared two drugs, or restarting Gilenya, but Ludden declined all medications. Tr. 17, 651. Ludden received a third opinion that same month from M. Mateo Paz Soldan, M.D., Ph.D. Tr. 17, 718. Dr. Soldan stated Ludden could take an observational approach to her MS, or in the alternative, she could consider taking a different medication. Tr. 18, 722. As stated above, Ludden declined to re-initiate any disease-modifying medications. Tr. 18, 525. Based on this medication synopsis, the ALJ concluded Ludden's symptoms were not as functionally limiting as she alleged. Tr. 16, 19.

Similarly, after reviewing the physicians' notes from Ludden's brain magnetic resonance imagings ("MRIs") and other symptoms, the ALJ concluded her functional limitations were not as severe as she alleged in her testimony. Tr. 19. According to her treating physicians, Ludden's brain MRIs were stable and showed no MS progression since 2008. Tr. 19. In May 2012, an MRI of Ludden's brain "look[ed] stable" with "no new intracranial demyelinating plaques" since May 2011.[5] Tr. 16, 527, 574-75. Dr. Soldan observed in July 2012 that "[t]here is no clear evidence at this time of progressive disability. The deficits documented on neurologic examination are likely incomplete recovery from her previous relapses." Tr. 18, 722. Brian G. Weinshenker, M.D., also reviewed Ludden's May 2012 MRI and found "no clear evidence of progressive disability/secondary progressive course, although she does have some mild neurologic deficits." Tr. 18, 725-26. Another brain MRI in November 2012 revealed no changes since her last MRI six

---

[5] Although there was a "slight increase in the overall burden of her lesions," there were no contrast-enhancing lesions. Tr. 16, 527, 572.

9

months prior. Tr. 18, 526, 567. Ludden did not continue any disease-modifying medication at the appointment since her MRIs were unchanged. Tr. 18, 525. Nicole M. Liebentritt, M.D., reported in May 2013 that Ludden also chose not to resume medication since she was "unable to tolerate them" and her disease was inactive. Tr. 525.

Dr. Liebentritt noted in May 2012 that Ludden did not report any changes in bladder functioning, denied any dizziness or vertigo, did not report any falls, and reported fatigue caused by trouble sleeping. Tr. 16-17, 528. Dr. Liebentritt observed that Ludden "[wa]s alert and oriented times three." Tr. 528. She went on, "Her extraocular movements are intact . . . . She has normal strength of her extremities, a mild reduction in sensation in the left upper and lower extremities which she tells me is baseline, normal coordination, and a mildly wide-based gait." Tr. 16, 528.

Ludden reported to Dr. Zabad that she had bladder control issues with urgency and hesitancy with rare leaks; some episodes of bowel incontinence; stiffness in her legs; "significant exhaustion after 2 pm"; severe night sweats; a decreased libido; some forgetfulness; and a fall three weeks prior. Tr. 17, 649. He observed Ludden was previously on medication to control bladder urgency and employed timed voiding, which were helpful. Tr. 17, 649. Moreover, he reported Ludden had "full" visual fields; normal gait and motor function; and some decreased sensory sensation in the "stocking distribution" left greater than right. Tr. 17, 650. He diagnosed Ludden with neurogenic bladder and encouraged her to see a urologist. Tr. 17, 651.

Dr. Soldan said Ludden reported "ongoing blurring of the central vision in her left eye"; mild weakness in her left hand and leg; "bladder symptoms that have been slightly worsening over the past year"; some concern with cognition; prominent fatigue; and difficulty sleeping at night. Tr. 17, 719-20. The medical record indicates Ludden self-reported that she typically naps for approximately ninety minutes in the afternoon. Tr. 720. The record also reveals that Dr. Soldan

10

recommended Ludden see a urologist, create a stretching and exercise program, strategically nap, and maintain sleep hygiene. Tr. 722-23.

The office notes from Steven V. Hagan, M.D., indicated Ludden had no urinary loss of control, dizziness, vertigo, motor disturbances, or vision problems in August 2012. Tr. 239-40. Dr. Hagan diagnosed Ludden with left patellofemoral pain and left shoulder rotator cuff tendinitis. Tr. 241. In October of that same year, Ludden's physical therapy notes from Dr. Hagan's office showed her physical function and activity was at 80% where 100% indicated normal activities without restrictions. Tr. 244.

Ludden saw Dr. Liebentritt in October 2012 and May 2013. Tr. 18, 525-26. She did not report any new symptoms on either occasion besides a recent infection at her 2012 appointment. Tr. 18, 525-26. She reported some bladder issues in 2013 but Dr. Liebentritt stated "[t]his is not a new problem and it's not any worse." Tr. 18, 525. Dr. Liebentritt observed at both appointments that Ludden had "normal strength of her extremities, normal coordination, and a mildly wide-based gait." Tr. 525-26. Ludden attended a urology appointment with Michael Kroeger, M.D., in May 2013, where he assessed her as having "possible neurogenic bladder secondary to MS." Tr. 19, 311. He ordered additional testing but there is no additional medical evidence prior to Ludden's date last insured. Tr. 19, 312.

The ALJ did not find that Ludden had any mental limitation prior to her date last insured. Tr. 20. Ludden told Dr. Liebentritt she had been feeling "useless" and somewhat depressed in May 2013. Tr. 18, 525. Dr. Liebentritt then increased her to 40 mg of Citalopram per day. Tr. 18, 525. Rebecca Braymen, Ph.D., and Christopher Milne, Ph.D., reviewed the evidence in October 2016

and March 2017 respectively, and found that Ludden's depression was not severe prior to her date last insured.[6] Tr. 20.

According to the ALJ, there was no opinion evidence from any treating physicians concerning Ludden's impairments or functional limitations during the relevant period. Tr. 19. She found the opinions of state agency consultants Alexandrea Suslow-Geditz, M.D., and Steven Higgins, M.D., "most consistent" with the objective record evidence. Tr. 19. They reviewed the record evidence in October 2016 and March 2017 respectively. Tr. 19. Both physicians opined that Ludden "could lift or carry up to twenty pounds occasionally and up to ten pounds frequently, and sit, stand, or walk for up to six hours . . . out of an eight-hour workday with normal breaks with no other limitations." Tr. 19, 64-65, 76. The ALJ did, however, increase Ludden's exertional limitation from the light level to the sedentary exertional level in order to account for her subjective complaints such as fatigue and other musculoskeletal symptoms.[7] Tr. 19. The ALJ also noted that Ludden was a caregiver for her young child during the relevant period. Tr. 19.

In concluding her step four analysis, the ALJ determined Ludden could perform sedentary work with some limitations and therefore could not perform past relevant work. Tr. 20. The ALJ gave "great weight" to Zadow's testimony regarding Ludden's RFC. Tr. 20.

At step five, the ALJ must determine whether the claimant is able to do any other work considering the claimant's RFC, age, education, and work experience. 20 C.F.R. § 404.1520(g). If the claimant is able to do other work, the claimant is not disabled. The ALJ determined there were significant numbers of jobs in the national economy that Ludden could perform. Tr. 21. The ALJ found Ludden could adjust to other work as a weight tester (DOT Number: 539.485-010),[8] auto

---

[6] Dr. Braymen explained Ludden's depression was not sufficient to assess her functional limitations, Tr. 63, while Dr. Milne found no evidence that Ludden's depression was causing severe mental health impairments, Tr. 74.
[7] The ALJ also included "additional visual, postural, and environmental limitations" in her RFC finding. Tr. 19.
[8] Due to a typographical error in the ALJ's decision, the weight tester DOT number has been corrected.

grinding machine operator (DOT Number: 690.685-194), or order clerk (DOT Number: 209.567-014). Tr. 21-22, 52-53. When adjusted for the fifty percent reduction in the total number of jobs to reflect Ludden's visual limitation, incidents of work in the United States were 227,000, 40,500, and 216,500 respectfully. Tr. 21-22. Therefore, the ALJ found Ludden "not disabled." Tr. 22. Since the Medical-Vocational Rules were used as a framework that supported a finding of "not disabled," transferability of job skills was not material to the disability determination according to the ALJ. Tr. 21.

## II.    DISCUSSION

### A.  Standard of Review

The Court reviews a denial of benefits by the Commissioner to determine whether the denial is supported by substantial evidence on the record as a whole. *Teague v. Astrue*, 638 F.3d 611, 614 (8th Cir. 2011) (citing 42 U.S.C. § 405(g)). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion." *Id.* (quoting *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008). The Court must consider evidence that both supports and detracts from the ALJ's decision and will not reverse an administrative decision simply because some evidence may support the opposite conclusion. *Perkins v. Astrue*, 648 F.3d 892, 897 (8th Cir. 2011). "If, after reviewing the record, the [C]ourt finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the [C]ourt must affirm the ALJ's decision." *Id.* (quoting *Medhaug v. Astrue*, 578 F.3d 805, 813 (8th Cir. 2009)). The Court should not reverse merely because it would have decided differently. *Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010). The Eighth Circuit has held that a court should "defer heavily to the findings and conclusions of the Social Security Administration." *Hurd v. Astrue*, 621 F.3d 734, 738 (8th Cir. 2010).

13

Additionally, the Court must determine whether the Commissioner's decision "is based on legal error." *Collins v. Astrue*, 648 F.3d 869, 871 (8th Cir. 2011) (quoting *Lowe v. Apfel*, 226 F.3d 969, 971 (8th Cir. 2000)). "Legal error may be an error of procedure, the use of erroneous legal standards, or an incorrect application of the law." *Id.* (internal citations omitted) (citing *Brueggemann v. Barnhart*, 348 F.3d 689, 692 (8th Cir. 2003); *Nettles v. Schweiker*, 714 F.2d 833, 836 (8th Cir. 1983)). No deference is owed to the Commissioner's legal conclusions. *Brueggemann*, 348 F.3d at 692 (stating that allegations of legal error are reviewed de novo).

## B.   Analysis

Ludden argues the ALJ erred by not providing "good reasons" for discrediting her alleged limitations and failing to account for her neurogenic bladder and fatigue issues in the RFC finding. Filing 12 at 8, 11. Ludden also argues the ALJ that "heard [her] claim was not properly appointed by a Department Head or the President" under the Appointments Clause. Filing 12 at 14-18. Ludden seeks to reverse the Commissioner's final decision, or in the alternative, remand the matter to a new, constitutionally appointed ALJ for further proceedings. Filing 1; Filing 12 at 14-18. As discussed below, the Court finds there was substantial evidence to support the ALJ's decision and that Ludden forfeited her Appointments Clause challenge.

### 1.   *Ludden's Credibility*

Ludden first argues the ALJ made an error by discounting the severity of her self-reported, MS-related impairments. Filing 12 at 2, 8-9. Ludden alleges the ALJ did not account for her daily activities or the other factors set forth in *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984), and simply reviewed the objective medical evidence when determining her credibility. Filing 12 at 9. Ludden also claims the ALJ should not have "dwell[ed] on symptom stability" when she reviewed the objective medical evidence. Filing 12 at 11. However, Ludden's arguments are unpersuasive.

As discussed below, the Court finds substantial evidence on the record as a whole existed to support the ALJ's decision.

"Credibility determinations are the province of the ALJ . . . ." *Julin v. Colvin*, 826 F.3d 1082, 1086 (8th Cir. 2016); *see also Igo v. Colvin*, 839 F.3d 724, 731 (8th Cir. 2016) ("The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts." (quoting *Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir. 2001))). The ALJ assesses a claimant's subjective complaints pursuant to *Polaski*:

> [T]he ALJ must make a credibility determination by considering the claimant's daily activities; duration, frequency, and intensity of the pain; precipitating and aggravating factors; dosage, effectiveness and side effects of medication; and functional restrictions. *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). Other relevant factors include the claimant's relevant work history and the absence of objective medical evidence to support the complaints.

*Mouser v. Astrue*, 545 F.3d 634, 638 (8th Cir. 2008) (second citation and quotation marks omitted).

Although an ALJ must consider the *Polaski* factors before discounting a petitioner's subjective complaints, ALJs "need not explicitly discuss each *Polaski* factor." *Wildman*, 596 F.3d at 968 (quoting *Goff v. Barnhart*, 421 F.3d 785, 791 (8th Cir. 2005)). Furthermore, if there are discrepancies in the record evidence, an ALJ may disbelieve a petitioner's subjective complaints. *Chaney v. Colvin*, 812 F.3d 672, 677 (8th Cir. 2016); *see also Julin*, 826 F.3d at 1086 (stating that "[a]n ALJ may decline to credit a claimant's subjective complaints 'if the evidence as a whole is inconsistent with the claimant's testimony'" (quoting *Cox v. Barnhart*, 471 F.3d 902, 907 (8th Cir. 2006))). Ultimately, the Court will defer to the ALJ if there is substantial evidence to support her credibility evaluation. *Julin*, 826 F.3d at 1086.

### a.   The ALJ's Discussion of *Polaski* Factors

Ludden's argument that the ALJ did not discuss her daily living activities or other *Polaski* factors is not supported by the evidence. Filing 12 at 9. The ALJ performed her analysis pursuant

to 20 C.F.R. §§ 404.1527, 1529 and SSR 16-3p, finding Ludden's MS impairments could reasonably be expected to cause her alleged symptoms but that the intensity, persistence, and limiting effects of her symptoms were not entirely consistent with the record evidence. Tr. 15-16. As stated above, the ALJ does not need to explicitly discuss each *Polaski* factor. *Wildman*, 596 F.3d at 968; *see also Novotny v. Saul*, No. 8:18-CV-437, 2019 WL 4942257, at *10 (D. Neb. Oct. 8, 2019) (holding that if ALJ does her analysis under 20 C.F.R. §§ 404.1529, she does not need to explicitly cite *Polaski* factors) (citations omitted).

Furthermore, the ALJ did consider Ludden's daily activities along with other *Polaski* factors. She discussed Ludden's daily activities, Tr. 15; dosage, effectiveness, and side effects of disease-modifying medication, Tr. 15-19; functional restrictions such as persistent fatigue, always knowing the location of public restrooms, and difficulty looking at computer screens, Tr. 15; relevant work history, Tr. 15, 20; and Ludden's self-reports of stabilizing symptoms, Tr. 16-18. *See generally Buckner v. Astrue*, 646 F.3d 549, 558 (8th Cir. 2011) (discussing that although ALJ did not cite specifically to *Polaski*, ALJ discussed multiple factors).

The ALJ considered the relevant factors under *Polaski* to the extent she was required by law. Importantly, the ALJ did not disregard Ludden's subjective complaints. Filing 12 at 9. Rather, she carefully reviewed them in accordance with *Polaski*, 20 C.F.R. § 404.1529, and SSR 16-3p.[9]

    b. Substantial Evidence Supports Partially Discrediting Ludden's Subjective Complaints

The ALJ decided to partially discredit Ludden's subjective complaints based on inconsistencies in the medical record. Tr. 19. In her decision, the ALJ noted that Ludden was a

---

[9] The ALJ in fact factored in Ludden's subjective complaints that were reasonably supported by the medical evidence when she lowered her RFC from the full range of the light exertional level—as opined by the state agency physicians—to sedentary work with additional limitations. Tr. 19-20.

caregiver for a young child during the relevant period, her brain MRIs were stable since 2008, and she consistently declined to resume disease-modifying medication despite having the option to do so. Tr. 19. Ludden takes issue with the ALJ's findings, arguing that the "ALJ did not provide good reasons supported by substantial evidence for finding [she was] . . . not credibly reporting her MS-related limitations." Filing 12 at 11. This error was harmful, according to Ludden, because her fatigue and urinary and bowel symptoms would have obligated her to be away from the job at least ten to fifteen percent of a workday—precluding any competitive employment. Filing 12 at 10. This Court, however, affirms the ALJ's decision since it was supported by substantial evidence.

The Court agrees with the ALJ that Ludden's daily activities raise concerns about her subjective complaints. Tr. 15-16, 19. The ALJ stated that Ludden provided care for her child, prepared meals, drove her child to school, and performed some household chores with occasional assistance. Tr. 15. Ludden also testified that she was able to grocery shop. Tr. 44. The ALJ noted she was a caregiver to a young child during the relevant period in addition to her conditions. Tr. 19. *See Roberson v. Astrue*, 481 F.3d 1020, 1025 (8th Cir. 2007) (holding that claimant engaged in "extensive daily activities" such as taking care of her eleven-year-old-child, driving her to school, fixing simple meals, doing housework, and going grocery shopping).

Second, the ALJ noted inconsistencies between Ludden's subjective complaints and her stable MS condition which in turn are supported by substantial evidence. Ludden's MS showed no progression since 2008 according to her physicians, Tr. 19; Tr. 527, 574-75 (May 2012 MRI "looked stable"); Tr. 722 (stating Dr. Soldan observed that "[t]here is no clear evidence of progressive disability"); Tr. 725-26 (stating Dr. Weinshenker found "no clear evidence of progressive disability/secondary progressive course"); Tr. 526, 567 (November 2012 MRI showed no changes). Ludden concedes the ALJ had substantial evidence to conclude her MS was stable

17

and her July 2012 self-reported symptoms remained the same throughout the relevant period. Filing 12 at 10-11. Additionally, the ALJ was correct to evaluate Ludden's symptom stability throughout the relevant period. This Circuit has held previously that "[t]he absence of any evidence . . . of deterioration or change in [claimant's] mental capabilities disfavors a finding of disability." *Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000) (citing *Dixon v. Sullivan*, 905 F.2d 237, 238 (8th Cir. 1990)). Therefore, the ALJ correctly noted inconsistencies between Ludden's subjective complaints and her stable MS condition.

Lastly, the ALJ found that Ludden declined to resume taking disease-modifying medication despite having the option to do so on multiple occasions. Tr. 19. This led the ALJ to conclude that Ludden's condition and symptoms were "stable and tolerable," Tr. 16, and not as functionally limiting as she alleged, Tr. 19. Substantial evidence exists to support this conclusion since Dr. Zabad recommended several different disease-modifying medications, but Ludden declined to take any of them. Tr. 17, 526, 651. Ludden also told Dr. Soldan she would like to continue an observational approach, despite having the opportunity to restart medication. Tr. 18, 722. She told Dr. Liebentritt later that year that she would consider resuming medication if her disease was still active. Tr. 18, 526. Although Ludden noted that she was "unable to tolerate" the medication, Tr. 18, 525-26, the medical evidence suggests otherwise. *See* Tr. 16, 541, 544-47 (normal echocardiogram indicates no physiological basis for hypertension or organ damage); Tr. 16, 532 (Ludden was prescribed anti-hypertensive medication to manage blood pressure); Tr. 16, 525-28 (anti-hypertensive medication was successful in controlling Ludden's blood pressure). Furthermore, the record indicates Dr. Zabad saw no reason for her not resuming Gilenya and that "more frequent dosing of interferon beta will lead to less frequent flu-like symptoms" when taking Rebif. Tr. 651.

There is substantial evidence that Ludden's condition and symptoms were not as functionally limiting as she alleged. If an ALJ's credibility determination is supported by substantial evidence, courts should defer to said conclusion since an ALJ is in a better position to evaluate credibility. *See Cox*, 471 F.3d at 907. The fact that Ludden continued to function as set forth above while declining to take medication—which she could have tolerated—supports that her symptoms were not as functionally limiting as she claims. Furthermore, even if Ludden's symptoms were as severe as she claimed, she could have taken medication to manage them but declined to do so. In *Andrews* for example, the Court upheld the ALJ's credibility analysis since he cited to the claimant's daily activities, appearance at the hearing, and non-compliance with medication regimens. *Andrews v. Colvin*, 791 F.3d 923, 929 (8th Cir. 2015).

With regard to her fatigue and neurogenic bladder issues, Ludden argues the ALJ erred in discrediting her testimony that these conditions precluded her from finding competitive employment because she would have required at least ten to fifteen percent time off work to take a nap and use the restroom. Filing 12 at 10. With the latter, and although Zadow testified that being off task ten to fifteen percent of the workday would generally not be tolerated by an employer, Tr. 53-54, Ludden does not demonstrate why she would need to use the bathroom four to five times a day in addition to a regular break schedule. With regard to her fatigue, *Blakeman v. Astrue*, 509 F.3d 878, 882 (8th Cir. 2007), held that "[m]any workers suffer from fatigue but are able to work, just as many people suffer from chronic pain that is not disabling. The issue is not whether [claimant's] heart condition is fatiguing, it is whether [his] fatigue is disabling." The fact Ludden often took an approximately ninety-minute nap in the afternoon is not indicative that she required that nap. Although there is some evidence that points in an alternative direction, Tr. 17, 649, 719-

20, this Court does not reverse a decision merely because other evidence supports a contrary outcome.[10] *Wildman* 596 F.3d at 964.

Under this deferential standard, the Court finds there was substantial evidence in the record for the ALJ to partially discredit the severity of Ludden's symptoms. The ALJ provided sufficient evidence where a "reasonable mind would find it adequate to support the conclusion." *Teague,* 638 F.3d at 614 (quoting *Finch,* 547 F.3d at 935).

### 2. *ALJ's RFC Determination*

Ludden next argues the ALJ erred by failing to account for her neurogenic bladder and fatigue issues in making her RFC determination. Filing 12 at 11. More specifically, Ludden argues that since the ALJ determined her bladder and fatigue issues were "severe," she needed to either 1) account for the impairments in the RFC determination or 2) explain the impairments' absence. With respect to her neurogenic bladder, Ludden argues the ALJ's RFC did not include any limitations such as "time off" to use the restroom. Filing 12 at 12. She also alleges the ALJ did not account for her fatigue. Filing 12 at 13. According to Ludden, since the RFC determination did not account for the above impairments, the hypothetical question posed to the vocational expert was deficient, and the ALJ lacked substantial evidence in her conclusion. Filing 12 at 13. As discussed below, the Court affirms the ALJ's RFC determination.

The RFC is "what the claimant can still do despite his or her physical or mental limitations." *Gann v. Berryhill,* 864 F.3d 947, 951 (8th Cir. 2017) (quoting *Lauer v. Apfel,* 245 F.3d 700, 703 (8th Cir. 2001)). The RFC determination is the responsibility of the ALJ. *Boyd v. Colvin,* 831 F.3d 1015, 1020 (8th Cir. 2016). "The ALJ must determine the claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others,

---

[10] Ludden's argument concerning her fatigue and urinary and bowel symptoms requiring her to be off task at least ten to fifteen percent of a workday is also addressed in the subsequent section as it relates to the ALJ's RFC determination.

and [the] claimant's own descriptions of [her] limitations." *Gann*, 864 F.3d at 951 (alterations in original) (quoting *Baldwin v. Barnhart*, 349 F.3d 549, 556 (8th Cir. 2003)). The claimant bears the burden to establish an RFC that indicates disability. *Goff*, 421 F.3d at 790..

"Because a claimant's [RFC] is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." *Mabry v. Colvin*, 815 F.3d 386, 390 (8th Cir. 2015). While "some medical evidence" must support an ALJ's decision, *Jones v. Astrue*, 619 F.3d 963, 971 (8th Cir. 2010), an ALJ need not tether the work capacity assessment to any particular medical opinion. *See Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016). Instead, the ALJ may rely upon a constellation of opinions, *see Julin*, 826 F.3d at 1088, or even the medical records themselves, *see Hensley*, 829 F.3d at 932.

The ALJ properly considered Ludden's RFC. She considered relevant evidence including the medical record, Ludden's subjective complaints, the vocational expert's testimony, and state agency physicians' opinions while noting a lack of opinion evidence from Ludden's treating physicians. *See generally* Tr. 15-20. The ALJ largely based her RFC findings on the medical records themselves and the opinions of the two reviewing physicians. Tr. 15-19 (extensively citing Ludden's medical records and noting the reviewing physicians' findings as "most consistent" with the objective record evidence). However, she did give some weight to Ludden's subjective complaints by increasing her exertional limitation from the light level with no limitations to the sedentary level with multiple limitations. Tr. 19. Given the ALJ's reliance on Ludden's medical records, the reviewing physicians' medical opinions, and Ludden's subjective complaints, there is "some medical evidence" supporting her RFC finding. *See Jones*, 619 F.3d at 971.

Ludden argues that when an ALJ concludes a claimant has a severe impairment at step two of the disability determination process, those impairments need to be factored in—or at least have

their absence explained—in the ALJ's RFC determination. Filing 12 at 11-12. Although Ludden

is correct in stating that 20 C.F.R. §§ 404.1523, 416.923 require an ALJ to "consider the combined

impact of the [severe] impairments throughout the disability determination process," her

"straightforward" argument is unavailing. Filing 12 at 11-12. The Court in *Dickerson* held that an

ALJ's step-two severe impairment finding did not require him to find those same impairments

disabling. *Dickerson v. Apfel*, 221 F.3d 1342 (8th Cir. 2000). For support, Ludden cites to *Bray*,

Filing 12 at 11, where the claimant's severe impairment was in fact accounted for in the RFC

finding. *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1228 (9th Cir. 2009). However, the

court explained that the claimant's argument that a severe mental impairment automatically

corresponded to limitations on basic work activities "offer[ed] no authority to support the

proposition." *Id.* at 1228-29. As indicated by *Dickerson* and 20 C.F.R § 404.1523, the Court's

function is to determine whether the ALJ considered Ludden's impairments. For the reasons stated

below, the ALJ did not err in her consideration of Ludden's severe impairments in the RFC finding.

     a.   Ludden's Fatigue

Ludden generally argues the ALJ did not account for her fatigue. Filing 12 at 14. However,

in her RFC determination, the ALJ specifically referenced Ludden's "complaints of fatigue" for

why she limited Ludden to sedentary work. Tr. 19-20. The ALJ also limited Ludden to "avoid all

exposure to extreme heat" based on her testimony. Tr. 15, 19, 46. This Circuit has held these

limitations are "significant" and demonstrate the ALJ gave some credit to the petitioner. *See*

*Choate v. Barnhart*, 457 F.3d 865, 869-70 (8th Cir. 2006) (discussing that limiting claimant to

walking or sitting for six hours in an eight-hour workday with extra limitations such as avoiding

extreme heat and working in well-ventilated environments indicated ALJ gave some weight to

treating physicians' opinions). Furthermore, and as stated above, there was substantial evidence

for the ALJ to partially discredit Ludden's subjective complaints regarding her symptom's intensity, persistence, and limiting effects.

      b.  Ludden's Neurogenic Bladder Issues

There is also substantial evidence in the RFC finding that show the ALJ considered Ludden's neurogenic bladder issues. Tr. 15, 17-19. Ludden similarly claims the ALJ failed to account for her neurogenic bladder issues such as giving "ready access to a bathroom or 'off task' allowance for . . . accidents." Filing 12 at 12. However, as set forth above, the ALJ partially discredited Ludden's subjective complaints regarding her bladder issues. There is also a lengthy synopsis of Ludden's neurogenic bladder issues in the ALJ's decision indicating the ALJ took this factor into consideration in crafting the RFC. *See* Tr. 15 (referencing Ludden stating she always knew where bathroom was located); Tr. 16-17 (stating Ludden denied any changes in bladder functioning ); Tr. 17 (finding Ludden reported urgency and hesitancy with rare leaks, success with previous medication, and three episodes of bowel incontinence); Tr. 17 (Dr. Zabad diagnosing Ludden with neurogenic bladder and encouraging her to see urologist); Tr. 18 (Ludden reporting no new bladder issues); Tr. 19 (Ludden attending a urology appointment). There is therefore substantial evidence that the ALJ adequately considered Ludden's bladder issues.

Furthermore, if a claimant's impairment can be controlled by medication, it cannot be considered disabling. *See Wildman*, 596 F.3d 959 at 965. Dr. Zabad stated "[Ludden] has urgency and hesitancy with rare leaks. She has seen a urologist Dr. Gordon. She has not seen him for a while. She was on medication and then stopped. The medication was helpful in addition to timed voiding. She is willing to go back to him." Tr. 17, 649. Dr. Liebentritt noted in May 2013 that Ludden "continues to have some bladder issues in terms of urgency. This is not a new problem and it's not any worse, but she is wondering whether she should go back and see the urologist."

Tr. 18, 525. The fact that medication was available to control her neurogenic bladder undermines the need for such accommodations.

Ludden has the burden to establish an RFC indicating disability. *See Goff*, 421 F.3d at 790. Even if there is a possibility that Ludden required additional accommodations that required her to be off task ten to fifteen percent of a workday, she fails to meet her burden. In *Swink*, for example, the claimant argued that the ALJ erred in the RFC determination because the ALJ did not include and comment on him frequently missing working days, being off task, or taking irregular breaks. *Swink v. Saul*, 931 F.3d 765, 770 (8th Cir. 2019). Although the Court observed some evidence to support his claims, it stated that "[t]he mere fact that some evidence may support a conclusion opposite to that reached by the Commissioner . . . does not allow this Court to reverse the decision of the ALJ." *Id.* (quoting *Johnson v. Barnhart*, 390 F.3d 1067, 1070 (8th Cir. 2004)). Ludden has not provided enough evidence to support the conclusion that she would need additional time off or would be off task ten to fifteen percent in addition to a regular morning, lunch, and afternoon break. *See generally* SSR 16-3P, 2017 WL 5180304 (S.S.A. Oct. 25, 2017).

Because the ALJ considered Ludden's bladder limitations and factored in her fatigue, the hypothetical question to the vocational expert was not deficient and the ALJ therefore had substantial evidence in concluding that there were significant numbers of jobs in the national economy for Ludden to perform. *See Gann*, 864 F.3d at 952 ("[T]estimony from a vocational expert constitutes substantial evidence only when based on a properly phrased hypothetical question." (quoting *Tucker v. Barnhart*, 363 F.3d 781, 784 (8th Cir. 2004))); *see also Hinchey v. Shalala*, 29 F.3d 428, 432 (8th Cir. 1994) (discussing that a hypothetical question needs to only include those impairments that the ALJ finds are substantially supported by the whole record).

To conclude, there is substantial evidence to support the ALJ's RFC findings. There was "some medical evidence" to support her finding and Ludden failed to meet her step-four disability burden. *Jones*, 619 F.3d at 971; *Goff*, 421 F.3d at 790.

### 3. Appointments Clause

 Ludden argues the ALJ that "heard [her] claim was not properly appointed by a Department Head or the President" under the Appointments Clause and thus, "the ALJ's denial of benefits should be vacated and [her] claim remanded for a new hearing before a new, constitutionally appointed, ALJ." Filing 12 at 14-18. The Commissioner responds that both the hearing and issuance of the ALJ's decision occurred after the ALJ's original appointment was constitutionally ratified. Filing 15 at 11-13. However, the Court need not reach this issue because Ludden concedes that her Appointments Clause challenge was not presented at any point during the administrative process. *See* Filing 16 at 3 ("As Defendant point out, and Plaintiff concedes, [the Appointments Clause issue] was not an argument presented at any point during the administrative process, but was raised for the first time on appeal to this Court.").

Addressing her failure to previously raise her Appointments Clause challenge, Ludden relies on *Cirko on behalf of Cirko v. Commissioner of Social Security*, 948 F.3d 148, 152, 159 (3d Cir. 2020), in which the Third Circuit Court of Appeals "decline[d] to require exhaustion" when the petitioners "had not previously presented their Appointments Clause Challenges to their ALJs or the Appeals Council and thus had not exhausted those claims before the agency." However, Ludden acknowledges "that resolution of this issue could be on its way" in the Eighth Circuit Court of Appeals given the consolidation of several cases raising the same issue. Filing 12 at 15.

On June 26, 2020, the Eighth Circuit addressed the issue of whether failure to raise an Appointments Clause challenge before the SSA resulted in forfeiture. *Davis v. Saul*, No. 18-3422,

2020 WL 3479626, at *1 (8th Cir. June 26, 2020). Similarly to Ludden, the petitioner in *Davis* argued that "constitutional claims need not be exhausted . . . ." *Id.* at *3. Addressing this argument, the Eighth Circuit noted that "[o]ther circuit courts have disagreed on whether exhaustion of the Appointments Clause issue before the SSA is required." *Id.* at *2 (comparing *Davis*, 2020 WL 3479626 (no exhaustion required), with *Cirko on behalf of Cirko*, 948 F.3d 148 (exhaustion required)). However, the court concluded that exhaustion was required, and this was not "'one of those rare cases in which we should exercise our discretion' to consider a non-exhausted claim." *Id.* at *4 (quoting *Freytag v. Comm'r*, 501 U.S. 868, 879, 111 S. Ct. 2631, 115 L. Ed. 2d 764 (1991)). Shortly thereafter, the Eighth Circuit again declined to consider a different petitioner's challenge to his ALJ's appointment because the petitioner "did not raise to the ALJ an Appointments Clause challenge." *Hilliard v. Saul*, No. 19-1169, 2020 WL 3864288, at *2 (8th Cir. July 9, 2020) (citing *Davis*, 2020 WL 3479626); *see also Williams-Ferguson v. Saul*, No. 8:19-CV-468, 2020 WL 4346812, at *16 (D. Neb. July 29, 2020) (finding Appointments Clause challenge forfeited for failure to exhaust); *Keck v. Saul*, No. 8:18CV476, 2020 WL 3868874, at *13 (D. Neb. July 9, 2020) (citing *Davis* and finding that the petitioner "forfeited his Appointments Clause challenge by failing to raise it during his administrative proceedings" regardless of whether an emergency measure instructing ALJs not to make any findings on Appointments Clause issues was in effect at the time of the petitioner's claim).

Given the Eighth Circuit's clear precedent declining to consider Appointments Clause challenges not raised and exhausted at the administrative level, the Court likewise declines to do so here. "[Ludden] did not raise to the ALJ an Appointments Clause challenge, so this court need not consider it." *Hilliard*, 2020 WL 3864288, at *2.

## III. CONCLUSION

The Court finds the Commissioner's final decision denying Ludden's claim for benefits under the Act should be affirmed.

**IT IS ORDERED:**

1.  The Commissioner's motion to affirm the Commissioner's final decision (Filing 14) is granted;

2.  Petitioner's motion for reversal and/or remand of the Commissioner's final decision (Filing 11) is denied;

3.  The Commissioner's final decision is affirmed;

4.  A separate judgment will be entered.


Dated this 31st day of July, 2020.

BY THE COURT:

Brian C. Buescher
United States District Judge
